# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## FORT WAYNE DIVISION

GEORGE P. DREW,         )
          )
    **Plaintiff,**        )
          )
    **v.**          )      **CAUSE NO. 1:07-CV-243**
          )
MICHAEL J. ASTRUE,     )
Commissioner of Social Security,   )
          )
    **Defendant.**      )

## OPINION AND ORDER

Plaintiff George P. Drew appeals to the district court from a final decision of the

Commissioner of Social Security ("Commissioner") denying his application under the Social

Security Act (the "Act") for a period of disability, Disability Insurance Benefits ("DIB"), and

Supplemental Security Income ("SSI").[1]  (*See* Docket # 1.)  For the following reasons, the

Commissioner's decision will be AFFIRMED.

## I.  PROCEDURAL HISTORY

In March 2004, Drew applied for DIB and SSI, alleging disability as of January 29, 2003.

(Tr. 67-69, 389-91.)  The Commissioner denied his application initially and upon

reconsideration, and Drew requested an administrative hearing.  (Tr. 27-29, 47-49, 52-56.)  On

October 31, 2006, Administrative Law Judge ("ALJ") Terry L. Miller conducted a hearing at

which Drew, who was represented by counsel, his mother, and a vocational expert ("VE")

testified.  (Tr. 394-441.)

---

[1]All parties have consented to the Magistrate Judge. *See* 28 U.S.C. § 636(c).

On January 16, 2007, the ALJ rendered an unfavorable decision to Drew, concluding that he was not disabled because he could perform a significant number of jobs in the national economy. (Tr. 14-26.) The Appeals Council denied Drew's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 5-10.) On September 21, 2007, Drew filed a complaint with the district court, seeking relief from the Commissioner's final decision. (Docket # 1.) Drew asserts one error in this appeal: that the ALJ improperly evaluated the opinion of Dr. Vijoy Varma, Drew's treating psychiatrist. (Opening Br. of Pl. in Social Security Appeal Pursuant to L.R. 7.3 ("Opening Br.") 18-21.)

## II.  FACTUAL BACKGROUND[2]

### A.  General Background

At the time of the ALJ's decision, Drew was thirty-three years old and had a high school education, which included attending some special education classes. (Tr. 67, 77.) He had past work experience as a factory worker, palletizer, stocker, fan assembler, sales clerk, production worker, janitor, forklift operator, and bagger. (Tr. 72, 147.) Drew contends that he became disabled due to Dysthymic Disorder,[3] Major Depressive Disorder, Generalized Anxiety Disorder, and math learning disorder. (Tr. 71; Opening Br. 2.)

### B.  Summary of the Relevant Medical Evidence

From 1984 to 1990, Drew underwent multiple examinations by school psychologists to assess his social, learning, and behavioral problems. (Tr. 149-56, 179-80.) Testing performed

---

[2]The administrative record in this case is 441 pages; therefore, in the interest of brevity, this opinion recounts only the portions of the record necessary to the decision.

[3]Dysthymic disorder is "a chronic disturbance of mood characterized by mild depression or loss of interest in usual activities[.]" STEDMAN'S MEDICAL DICTIONARY 569 (28th ed. 2006).

on October 16, 1984, revealed that Drew viewed himself as a "a loner" and experienced feelings of inferiority; that he tended to respond inappropriately at times, creating difficulties with his peers; and that he became angry when frustrated with academics. (Tr. 156.) He showed weaknesses in "organization, self-responsibility, work completion, and consistent effort." (Tr. 156.)

A psychological evaluation was performed on October 26, 1984, when Drew was in the fourth grade, because he demonstrated behavior problems at school; he was, however, friendly and cooperative during the evaluation. (Tr. 149.) Drew showed feelings of inadequacy, rejection, depression, and withdrawal. (Tr. 150.) The testing suggested areas of neuropsychological deficit which were possibly the result of acute brain trauma. (Tr. 149, 151-52.) The diagnostic clinician and clinical psychologist concluded that Drew had average intellect but significant levels of neuropsychological deficit affecting the academic areas of writing, arithmetic, and spelling, as well as his memory. (Tr. 151.) The evaluation suggested that Drew undergo a neurological evaluation and be considered for peer group placement in order to address his socialization skills and need for encouragement. (Tr. 151-52.)

In March 1987, the school performed a psychological evaluation to meet state requirements for special education students. (Tr. 153.) The evaluation revealed that Drew was functioning in the average range of mental ability with stronger performance skills than verbal skills. (Tr. 153-54.) However, Drew continued to qualify for special education programming because his grapho-motor speed was slow, he had difficulty with auditory sequencing, and his achievement levels ranged from third grade in arithmetic to sixth grade in reading. (Tr. 154.)

In October 1990, when Drew was in the tenth grade, a school psychologist performed an

evaluation, including various tests, revealing that overall his intellect was average. (Tr. 179-80.) His weaknesses were in vocabulary, written language skills, and mental computation of arithmetic and visual tracing. (Tr. 180.) His academic skills in math were "severely discrepant in terms of [Drew's] expectancy," his written language skills were borderline to severely weak, and reading was his strongest academic area. (Tr. 180.)

On December 28, 2000, Sherwin Kepes, Ph.D., performed a psychological evaluation at the request of Vocational Rehabilitation. (Tr. 182-87.) Dr. Kepes observed that Drew had slight but noticeable body odor and made almost no eye contact, but was cooperative and put forth a good effort. (Tr. 183-84.) Dr. Kepes noted that Drew evidenced an adequate level of perseverance when presented with difficult items. (Tr. 184.) Academic testing indicated that he was basically literate but had a mathematics disorder. (Tr. 184-85.) Personality testing indicated Drew had feelings of anxiety, depression, inferiority, and inadequacy. (Tr. 185.) He was frustrated and angry over his limitations, had difficulty dealing with his feelings, and was somewhat uncomfortable in interpersonal situations, but did appear to derive support from family relationships. (Tr. 185-86.) Dr. Kepes concluded that Drew was in the average range of intelligence, although he had learning difficulties, and that he showed greater potential for performance-oriented tasks. (Tr. 186.) Dr. Kepes diagnosed Dysthymic Disorder; mathematics disorder; and learning disorder, NOS. (Tr. 186.)

On April 28, 2004, Kenneth Bundza, Ph.D., performed a psychological evaluation of Drew at the request of the Division of Family and Children. (Tr. 188-91.) Drew reported depression and social isolation. (Tr. 188.) He made several negative statements, and Dr. Bundza found his affect flat, depressed, and negative. (Tr. 188-89.) However, Dr. Bundza also observed

that Drew maintained appropriate emotional control, was reasonably cooperative, and appeared to be putting forth a good effort. (Tr. 189.) Dr. Bundza noted that he was alert and oriented, knew basic information, and had adequate judgment and common sense. (Tr. 189-90.) Drew indicated that he had worked six years for a supermarket in carry out and warehouse work, and that after 1996 his employment became sporadic, having last worked in January 2003. (Tr. 188.) On an IQ test, his scores were in the average range, and Dr. Bundza stated that the results did not indicate any cognitive or intellectual impairments, although the tests did support a diagnosis for learning disability. (Tr. 190-91.) Dr. Bundza diagnosed major depressive disorder, recurrent, moderate; mathematics disorder; and reading disorder. (Tr. 191). He assessed a Global Assessment of Functioning ("GAF") score of 65.[4] (Tr. 191.)

In 2004, the Bureau of Vocational Rehabilitation placed Drew with Goodwill Industries of Northeast Indiana, Inc., for job placement. (Tr. 225-62.) Drew explained that he did not want to work in crowds, but rather in small groups or independently. (Tr. 239, 246.) In April 2004, Drew was offered a full-time job at a maintenance company for $6.00, but he turned it down. (Tr. 226, 253.) Although Drew would be eligible for raises and the job would likely become part-time, he explained that he did not want to work in that location due to lack of transportation, and he did not want a part-time job or a job that paid less than $7.00 per hour. (Tr. 226-27, 253.) Drew was told about an opening elsewhere but he felt it was too far to drive. (Tr. 253). Notes

---

[4]GAF scores reflect a clinician's judgment about the individual's overall level of functioning. American Psychiatric Association, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed., Text Rev. 2000). A GAF score of 41 to 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id.* A GAF score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.* And, a GAF score of 61 to 70 reflects some mild symptoms or some difficulty in social, occupational, or school functioning, but "generally functioning pretty well." *Id.*

from his last meeting on May 6, 2004, state that his case was interrupted until he received mental health counseling and medication to assist him to change his "overly defeatist" attitude and he acquired reliable transportation. (Tr. 226-27.) The counselor referred him to Park Center, Inc., and instructed him keep in touch about his progress. (Tr. 221, 227.)

On May 4, 2004, Drew visited Judy Woodyard, M.A., L.M.F.T., L.C.S.W., a counselor at Park Center. (Tr. 221-24.) Drew reported constant depression and anxiety, and that it was currently extreme. (Tr. 221.) He stated that he has trouble sleeping, worries a lot, has nightmares, and is afraid to be around people. (Tr. 221.) Ms. Woodyard observed that Drew's behavior was withdrawn, agitated, destructible, slow, and immature; he made poor eye contact; his mood and affect were anxious, flat, and depressed; and his insight was minimal and his judgment was poor. (Tr. 222.) Ms. Woodyard diagnosed major depressive disorder, single episode; general anxiety; Dysthymia; and math learning disorder. (Tr. 223.) She assessed his GAF score at 50.[5] (Tr. 223.)

On May 13, 2004, B. R. Horton, Psy. D., a state agency psychologist, reviewed the record
and opined that Drew had no severe mental impairments; this determination was affirmed on October 18, 2004. (Tr. 192-205.)

On May 23, 2004, Barbara Gelder, Ph.D., a licensed psychologist, evaluated Drew at the state agency's request. (Tr. 207-11.) Drew reported being upset most of the time; having angry thoughts; and difficulty keeping friends, controlling his temper, and being cooperative. (Tr. 207.) Dr. Gelder noted that Drew was cooperative and willing to discuss relevant personal

---

[5] *See supra* n.4.

information, but his eye contact was poor.  (Tr. 208, 210.)  Dr. Gelder observed that he was

oriented and had a reasonable fund of general knowledge.  (209-10.)  When the doctor asked

Drew if he could attend to a simple repetitive task continuously for a two hour period, he stated

that he thought he could, but that his work pace and need for supervision would depend on the

working conditions.  (Tr. 211.)  Dr. Gelder also noted that he does housework and has art-related

interests.  (Tr. 211.)  Dr. Gelder diagnosed Dysthymia, learning disability in mathematics and

reading, and possible attention deficit hyperactivity disorder (ADHD), and assessed his current

GAF score at 45 and past at 47.[6]  (Tr. 211.)

On June 14, 2004, Drew began seeing Vijoy Varma, M.D., a psychiatrist at Park Center.

(Tr. 217-20.)  Drew related that he had anxiety and feelings of torment and degradation, and that

he heard voices of his father and mother fighting with each other.  (Tr. 217.)  He stated that he

did not trust anybody; was upset and angry with the world; and when angry, he sometimes hit

inanimate objects and punched holes in the wall, but did not hit people.  (Tr. 217.)  Drew

reported some suicidal ideas but no history of suicidal acts.  (Tr. 217.)  He informed that he had

worked at a supermarket for five years and had been in two long-term relationships.  (Tr. 218.)

Dr. Varma indicated that Drew was cooperative during the interview, his speech was relevant

and coherent, his thought processes were logical and organized, and he was in good control of

his impulses.  (Tr. 219.)  Dr. Varma observed that Drew's general knowledge and calculations

were "remarkably good" and placed his intelligence "well-within the average range."  (Tr. 219.)

Dr. Varma diagnosed a generalized anxiety disorder and a learning disorder NOS (not otherwise

specified) and assessed a GAF score of 50.  (Tr. 219.)  He prescribed medications to address

---

[6]*See supra* n.4

Drew's depression, anxiety, and anger problems.  (Tr. 219.)

Throughout the rest of 2004, Drew saw Dr. Varma three more times – in September, October, and December.  (Tr. 273.)  Drew continued to report the same problems with anxiety, depression, self-esteem, and anger.  (Tr. 273.)  Dr. Varma adjusted his medications, and in one note indicated that one of the prescriptions had helped improve Drew's sleep and caused him to be "more mellow."  (Tr. 273.)

In 2005, Drew visited Dr. Varma approximately eight times, continuing to deal with the same issues.  (Tr. 266-72.)  Drew reported outbursts of anger, at both family members and strangers in public.  (Tr. 266-72.)  The confrontations were verbal, however, with no physical aggression, although he reported that in one instance others had to hold him back and two other occasions almost resulted in blows.  (Tr. 266-72.)  However, Dr. Varma also reported instances when Drew's judgment was "quite fair" and his speech was relevant and coherent; that there was no indication of delusions or hallucinations; and that he was "in good control" and was cooperative and considerate.  (Tr. 267-68, 270.)  Although Drew occasionally admitted to some suicide ideation, he never had any intent or plan.  (Tr. 266-72.)  Dr. Varma often adjusted his medications.  (Tr. 266-72.)

From March through July 2006, Drew saw Dr. Varma approximately three times.  (Tr. 264, 368, 388.)  Drew's mother reported that Drew had been walking rigidly and puckering his lips.  (Tr. 368, 388.)  At one point Drew ran out of his medicine and reported feeling confused and frustrated.  (Tr. 368.)  Dr. Varma regulated his medications.  (Tr. 264, 368, 388.)

From March through August 2006, Drew had approximately twelve individual counseling sessions at Park Center with Rhonda McDonald.  (Tr. 263-64; 368, 378, 381, 388.)

Drew discussed his problems with anger, depression, and anxiety. (Tr. 263-62; 368, 378, 381, 388.) He stated that he enjoyed playing the guitar, listening to and writing music, and watching horror movies. (Tr. 265.) He stated that he was entertained by "sick" movies because normal people were getting the "short end of the stick" and that although he wrote "sick lyrics" he would never do what he wrote about. (Tr. 265.) He denied any suicidal or homicidal ideation. (Tr. 265.) Drew also stated that he did not want to go out in public and that he has anxiety when he sees someone he knows. (Tr. 263.) Drew reported stomach aches and trouble sleeping at times. (Tr. 263, 381, 388.) Drew also discussed his feelings of worthlessness and reported that he coped by talking with his mother, watching television, and playing guitar. (Tr. 378.) He also reported having a verbal altercation with a stranger in a parking lot because "she wouldn't mind her business." (Tr. 368.)

From August through September 2006, Drew saw another counselor, masters level intern Tara Pelz, approximately three times. (Tr. 362, 368.) He reported continuing anger problems, outbursts, and feelings of shame and guilt. (Tr. 362, 368.) Drew and his mother expressed concern over Drew's enjoyment and laughter at horror films, and he also reported that he likes to write disturbing song lyrics. (Tr. 368.) He also continued to report mouth tremors. (Tr. 362.)

On September 21, 2006, Drew's Park Center treatment plan was reviewed. (Tr. 363-65). He was diagnosed with generalized anxiety with panic attacks and learning disability NOS. (Tr. 363.) His present GAF score was assessed at 50. (Tr. 363.)

On October 6, 2006, Drew saw Dr. Varma and discussed anger issues. (Tr. 355.) He also reported experiencing mouth movements, although Dr. Varma did not observe any. (Tr. 355.) Dr. Varma continued the same medications as before but added Vitamin E to help with the

mouth movements. (Tr. 355.) Drew also visited Ms. Pelz twice in October for counseling. (Tr. 353-54.) Drew expressed anger after seeing Dr. Varma because he felt that Dr. Varma did not understand him, and he was frustrated because he did not believe the medications were working. (Tr. 354.) He also indicated problems sleeping. (Tr. 353.) They discussed techniques to cope with his anger, such as taking "time outs" and breathing exercises. (Tr. 353.)

On October 20, 2006, Dr. Varma completed a Medical Source Statement of Ability to Do Work-Related Activities and a Mental Impairment Questionnaire. (Tr. 347-51.) He opined that Drew had no useful ability to carry out short, simple instructions; understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; work with or near others without being distracted by them; get along with co-workers and peers; and respond appropriately to changes in the work setting. (Tr. 347-48.) He had a "fair" ability (meaning that he "can perform the activity satisfactorily some of the time") to remember locations and work-like procedures; understand and remember short, simple instructions; interact appropriately with the public; accept instructions and respond appropriately to criticism from supervisor; maintain socially appropriate behavior; and set realistic goals or make plans independently of others. (Tr. 347-48.) Dr. Varma had reviewed affidavits from Drew's sisters, the evaluations of Dr. Bundza and Dr. Gelder, and Drew's school records. (Tr. 249.) He opined that Drew would be absent from work about two days per month (Tr. 351) and made in an entry in Drew's progress notes that he believed Drew was totally disabled as far as jobs were concerned. (Tr. 354.)

### III. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and

transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

## IV. ANALYSIS

### A. *The Law*

Under the Act, a claimant is entitled to DIB or SSI if he establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A), 1382c(a)(3)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic

techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform his past work; and (5) whether the claimant is incapable of performing work in the national economy.[7] *See* 20 C.F.R. §§ 404.1520, 416.920; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

### B. The ALJ's Decision

On January 16, 2007, the ALJ rendered his opinion. (Tr. 14-26.) He found at step one of the five-step analysis that Drew had not engaged in substantial gainful activity since his alleged onset date and at step two that Drew had the following severe impairments: major depressive disorder and dysthymia with mood instability, generalized anxiety disorder, anger control problems suggestive of a personality disorder, learning disorder, mathematics disorder, reading disorder, and history of drug and alcohol usage. (Tr. 17.) At step three, he determined that

---

[7] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite his limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a), 416.920(e), 416.945(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. §§ 404.1520(e), 416.920(e).

Drew's impairment or combination of impairments were not severe enough to meet a listing.

(Tr. 17.)  Before proceeding to step four, the ALJ determined that Drew's testimony of

debilitating limitations was "not entirely credible" (Tr. 24) and that he had the following RFC:

> [T]he claimant has no exertional limitations.  However, he has the residual
> functional capacity to perform only simple, routine, repetitive tasks that do not
> involve a fast-paced production environment, more than relatively few workplace
> changes, or more than one[] or two-step tasks.  In addition, the claimant is not
> able to work with the general public and he is able to have only occasional and
> brief interactions with supervisors and co-workers.  He also works best alone or in
> small groups.  His job instructions must be reduced to writing and be in printed
> format.  Furthermore, the claimant cannot do any prolonged reading for content or
> comprehension with a reading recognition level at the 6th grade level and spelling
> at the 6th grade level.  Finally, he cannot do any work requiring mathematical
> calculations, such as in cashier or teller work, and he can do only 4th grade level
> arithmetic.

(Tr. 17.)

Based on this RFC and the VE's testimony, the ALJ concluded at step four that Drew

could not perform his past relevant work, but found at step five that there are a significant

number of jobs in the national economy that he could perform, such as dishwasher/kitchen

helper, hand packager, laundry folder, and cleaner/maid.  (Tr. 24-25.)  Therefore, Drew's claims

for DIB and SSI were denied.  (Tr. 25-26.)

### C.  The ALJ's Evaluation of Dr. Varma's Opinion Is Supported by Substantial Evidence

Drew's sole argument is that the ALJ erred by failing to properly evaluate the opinion of

Dr. Varma, his treating psychiatrist.  This assertion fails to provide a basis for a remand.

The Seventh Circuit Court of Appeals has stated that "more weight is generally given to

the opinion of a treating physician because of his greater familiarity with the claimant's

conditions and circumstances."  *Clifford*, 227 F.3d at 870; *see also* 20 C.F.R. §§ 404.1527(d)(2),

416.927(d)(2).  However, this principle is not absolute, as "a treating physician's opinion

regarding the nature and severity of a medical condition is [only] entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record." *Clifford*, 227 F.3d at 870; *see also* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *Johansen v. Barnhart*, 314 F.3d 283, 287 (7th Cir. 2002).

In the event the treating physician's opinion is not well supported or is inconsistent with other substantial evidence, the Commissioner must apply the following factors to determine the proper weight to give the opinion: (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) how much supporting evidence is provided; (4) the consistency between the opinion and the record as a whole; (5) whether the treating physician is a specialist; and (6) any other factors brought to the attention of the Commissioner. 20 C.F.R. §§ 404.1527(d), 416.927(d); *see also Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996). The Commissioner must always give good reasons for the weight ultimately applied to the treating source's opinion. *Clifford*, 227 F.3d at 870; *see also* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

In this instance, the ALJ explained that the state agency psychologists found no severe mental impairment, while Dr. Varma opined that Drew was totally disabled and that he had no useful ability to carry out short and simple instructions; understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; work with or near others without being distracted by them; get along with co-workers and peers; and respond appropriately to changes in the work setting. (Tr. 20-21.) The ALJ found it reasonable not to assign great weight to the state agency's opinion because it was not consistent with records of learning disorders and problems with reading and math, and because Drew received mental

14

health treatment at Park Center after the state agency doctors reviewed his record. (Tr. 21.) The

ALJ next addressed Dr. Varma's opinion:

> In addition, the undersigned does not assign great weight to Dr. Varma's opinion either because it is not fully supported by the treatment record nor is it consistent with the record as a whole. The claimant testified that he did not know how old he was but he knew how old he was at a mental status examination in 2004. He had the cognitive ability to obtain a driver's license and the IQ scores throughout his lifetime are consistently well within the average range. He also performed substantial gainful work activity in the past with no apparent documentation of special consideration or accommodations. The undersigned therefore concludes that the claimant is not as limited as he and his relatives and Dr. Varma indicated.

> Although the undersigned finds that the claimant may be a rather marginally functioning individual, the evidence as a whole does not establish that he would be incapable of simple, routine, low stress work activity with no intense contact with others, involving no need for comprehensive reading or math skills, consistent with the residual functional capacity noted in this decision.

(Tr. 21 (citations omitted).)

The ALJ then delved into a detailed review of the record, composing about three pages,

having already penned three pages on it earlier in the opinion. In that review, the ALJ described

the various medical records (including Dr. Varma's), the records from the vocational agency,

and Drew's testimony. (Tr. 21-24.) This extensive treatment of Drew's case, however, did not

deter Drew from finding fault with the ALJ's determination, and he contends that the ALJ

improperly evaluated Dr. Varma's opinion.

Drew first takes issue with the ALJ's reasoning concerning Drew's cognitive ability;

specifically, Drew contends that the ALJ did not explain how the ability to obtain a driver's

license and the average IQ scores conflict with Dr. Varma's limitations on Drew's ability to

work with others. (Opening Br. 19.) This argument is ultimately without merit, because Dr.

Varma did not only evaluate Drew's ability to work with others, but also his cognitive abilities,

placing severe limitations on his abilities to carry out simple instructions; understand, carry out, and remember detailed instructions; and maintain attention and concentration for extended periods.  (Tr. 347.)  Thus, the ALJ's reason clearly goes to Dr. Varma's cognitive assessments.  Moreover, the ALJ's reasoning is sound, as Drew's average IQ scores (*see, e.g.,* Tr. 190-91) and his ability to get a driver's license (Tr. 400) certainly undermine extreme mental limitations.

Drew also maintains that contrary to the ALJ's reasoning, he indeed needed accommodation in the past to perform his jobs, pointing to his testimony that he needed assistance with math at his last job.  (Opening Br. 19.)  This argument, however, does not require a remand.  The ALJ specifically reasoned, "He also performed substantial gainful work activity in the past *with no apparent documentation* of special consideration or accommodations."  (Tr. 21 (emphasis added).)  Drew's attempt to point to *his own testimony*, therefore, does not necessarily conflict with the ALJ's statement that there is no documentation of accommodations in his past jobs.  And despite Drew's assertion that "the ALJ hangs his hat on [Drew's] ability to work until 2003" (Reply Br. 3), the ALJ in fact provided several other reasons for discounting Dr. Varma's opinion, including that the driver's license and average IQ scores showed less than total disability, that Dr. Varma's own treatment records conflicted with his severe limitations, and that the evidence as a whole did not support his opinion.  Therefore,  we will not entertain Drew's attempt to nitpick the ALJ's decision.  *See generally Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004) ("And while the ALJ must have built a logical bridge from the evidence to his conclusion, we will nonetheless give the opinion a commonsensical reading rather than

nitpicking at it." (citations and internal quotation marks omitted)).[8]

Lastly, Drew contends that the ALJ made no attempt to explain his reasoning that Dr. Varma's opinion is inconsistent with the treatment record. This contention, however, ignores the fact that the ALJ dedicated a half of a page to Dr. Varma's June 2004 assessment, pointing to various notes that he could reasonably construe as conflicting with the extreme limitations in Dr. Varma's later evaluation. Indeed, the ALJ specifically mentioned the following from Dr. Varma's notes: that Drew was cooperative; that his thought process was logical and organized; that his speech was relevant and coherent; that he denied persecutory concerns or hallucinations; that his affect was congruent and responsive to context; that he denied any angry, homicidal, or suicidal ideas or intents; that he was in good control of his impulses; that Drew was fully oriented; and that his knowledge was "remarkably good" and his intelligence in the average range. (Tr. 23.) The ALJ's reasoning is thus easily traced, in light of the various notes which are arguably inconsistent with Dr. Varma's assessment of extreme limitations. *See Skarbek v. Barnhart,* 390 F.3d 500, 503-04 (7th Cir. 2004) (stating that an ALJ may discount a treating physician's opinion if it is not well-supported by medical findings or is inconsistent with substantial evidence of record, as long as he minimally articulates his reasons for crediting or

---

[8]Drew also maintains that his past substantial gainful activity does not conflict with Dr. Varma's opinion since there is evidence that his condition has worsened over time. He highlights his earnings record, indicating sporadic employment and temp work, and that his vocational rehabilitation was interrupted due in part because of his need for counseling. (Opening Br. 19-20.) This argument does not demonstrate that the ALJ erred, however. Significantly, as the ALJ noted in his opinion, Drew in fact turned down employment because he did not want to work part-time or below a certain wage rate, not out of a concern for his mental health. (Tr. 21, 226-27, 253.) Moreover, at the hearing, when the ALJ asked him if he could work somewhere where he could perform simple routine tasks with no reading or math problems and not a lot of interaction with others, Drew indicated that he did not think so because he did not believe such jobs were available, not because he did not think he was capable of doing them. (Tr. 21-22, 419.) Also, vocational rehabilitation halted services because of transportation problems and his need for counseling based on his "defeatist attitude," not because of any cognitive inability or problems getting along with others. (Tr. 20-21, 225-27.) Thus, even if Drew's condition may have worsened over time, there is nevertheless a basis in the record for the ALJ's reasoning that Drew's employment history defies allegations of complete disability.

rejecting evidence of disability).

In deciding that Dr. Varma's opinion did not merit great weight, he assessed the opinion under several of the factors set forth in 20 C.F.R. §§ 404.1527(d) and 416.927(d). *See generally Books*, 91 F.3d at 979 (articulating that when conflicting medical evidence exists, the ALJ must consider the factors articulated in 20 C.F.R. §§ 404.1527 and 416.927). The ALJ considered that Dr. Varma was Drew's treating specialist in psychiatry, specifically noting that Dr. Varma was Drew's "treating psychiatrist at Park Center." (Tr. 23); *see* 20 C.F.R. §§ 404.1527(d)(5), 416.927(d)(5). He further considered the length and frequency of the treatment relationship in noting that Drew received "regular mental health treatment at Park Center" and that the treatment notes extended from 2004 to time of the ALJ's decision. (Tr. 21, 23); *see* 20 C.F.R. §§ 404.1527(d)(2)(i), 416.927(d)(2)(i).

Despite Dr. Varma's specialty and the long-term treatment relationship, the ALJ found that another factor, consistency with the evidence as a whole, undermined Dr. Varma's opinion. (Tr. 21); *see Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008) ("[T]he ALJ showed that he was aware of the roles these doctors played in Berger's treatment, but he nonetheless decided to discount their medical opinions for [other reasons]. This was not error.") (citing *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006)); *see also* 20 C.F.R. §§ 404.1527(d)(4), 416.927(d)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion."). In so finding, he gave examples from the testimony and enumerated notes from the three examining physicians' records illustrating his point.

For instance, ALJ set forth details from the testimony that seem to contradict the

allegations of total disability, such as Drew's rejection of a job opportunity because of transportation and the fact that it was part-time, not because of any concerns it posed his mental health. (Tr. 21.) He also delved into the various opinions of the examining physicians, finding that they "clearly show that [Drew] retains work-related capabilities." (Tr. 22.) He discussed Dr. Kepes observations that Drew was cooperative, put forth a good effort, had an adequate level of perseverance with difficult items, had average intelligence, was basically literate, and had above-average abilities with respect to performance-oriented tasks. (Tr. 22.) The ALJ also discussed Dr. Bundza's findings that Drew had an average IQ, appropriate emotional control in the interview, was reasonably cooperative, put forth a reasonable degree of effort, was alert and oriented, knew basic information, and had adequate judgment and common sense. (Tr. 22.) The ALJ addressed Dr. Gelder's opinion as well, pointing to her findings that Drew knew basic information and was well-oriented; that he was cooperative and responsive to questions; that he does housework, and that when asked if he could attend to simple repetitive tasks continuously for a two-hour period, he stated that he believed he could. (Tr. 22.) The ALJ, therefore, thoroughly addressed the regulatory factor of consistency with the record as a whole, highlighting aspects of the witness testimony and the less severe findings of three examining physicians which could be construed as inconsistent with Dr. Varma's grave opinion.

"If the ALJ discounts the physician's opinion after considering these factors, we must allow that decision to stand so long as the ALJ 'minimally articulate[d]' his reasons –a very deferential standard that we have, in fact, deemed 'lax.'" *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008) (citing *Berger*, 516 F.3d at 545 (internal quotation marks and citation omitted). Because the ALJ addressed the regulatory factors and adequately articulated reasons for not

assigning great weight to Dr. Varma's opinion, the ALJ clearly evaluated Dr. Varma's opinion in accordance with 20 C.F.R. §§ 404.1527 and 416.927.[9]

Furthermore, to the extent that the record contains conflicting evidence concerning the severity of Drew's mental limitations, it is the ALJ's role to weigh the conflicting medical evidence and resolve the conflicts. *See Richardson v. Perales*, 402 U.S. 389, 399 (1971) ("We . . . are presented with the not uncommon situation of conflicting medical evidence. The trier of fact has the duty to resolve that conflict."). Here the ALJ did just that, toiling through numerous medical opinions of record to resolve the conflicts. Though Drew may disagree with the ALJ's ultimate weighing of the evidence, such disagreement does not provide a basis for overturning

_____

[9]In his reply brief, Drew cites to the recent Seventh Circuit Court of Appeals case *Bauer v. Astrue*, 532 F.3d 606 (7th Cir. 2008), and argues at length that the ALJ's reasoning does not demonstrate that Dr. Varma's opinion is "seriously flawed." (*See generally* Reply Br.) Drew's attempt to use *Bauer* to attack the ALJ's determination in this instance is unsuccessful. In *Bauer*, the ALJ discounted the opinions of two long-term treating psychiatrists, and the court found that this determination was erroneous because it showed "a lack of acquaintance with [the claimant's] bipolar disorder." *Bauer*, 532 F.3d at 608. Indeed, in *Bauer*, the court found that the ALJ erred in discounting the physicians' opinions on the basis that the claimant was able to attend to basic self-care and household chores, without considering other evidence that she was heavily medicated and required substantial assistance. *Id.* at 608-09. The court further found the ALJ's other reason for discounting the physicians' opinions, that one of the doctor's treatment notes were contradictory because they indicated that the claimant was doing well at times, was erroneous because it ignored the erratic nature of her chronic illness. *Id.* at 609. These inadequacies are not present in the instant case. Here, in contrast, there is only one treating psychiatrist, and the ALJ arrived at his determination by following the requirements set forth in the relevant Social Security regulations and Seventh Circuit case law; he adequately articulated reasons for discounting the opinion, he set forth examples of inconsistencies from Dr. Varma's own treatment records and the consultative physicians' evaluations, and he evaluated various regulatory factors throughout. *See Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006) (explaining the steps involved in the treating source rule and commenting that "the weight properly to be given to testimony or other evidence of a treating physician depends on circumstances"); *see also Berger*, 516 F.3d at 545 ("An ALJ must only minimally articulate his or her justification for rejecting or accepting specific evidence of a disability." (internal quotation marks and citation omitted)). Accordingly, Drew's arguments based on *Bauer* fail to demonstrate a basis for remand.

Moreover, although Drew implies that the ALJ accorded no weight to Dr. Varma's opinion (*see* Reply Br. 3), the ALJ actually acknowledged that Drew has serious impairments, describing him as a "rather marginally functioning individual" (Tr. 21), and even credited Dr. Varma's opinion somewhat by incorporating significant limitations in the RFC concerning his abilities in math and reading and interacting with others. Thus, the ALJ did give some weight to Dr. Varma's opinion, just not to the degree that it asserts that Drew "would be incapable of simple, routine, low stress work activity with no intense contact with others, involving no need for comprehensive reading or math skills . . . ." (Tr. 21.) *See, e.g.,Thao v. Astrue*, No. 08-C-0033, 2008 WL 2937425, at *4 (E.D.Wis. July 24, 2008) ("[T]he ALJ did not entirely reject the reports. He found that plaintiff suffered from the severe impairments listed in the reports; he simply disagreed with the extent of limitation assessed by plaintiff's doctors.").

the ALJ's decision.  *See Schmidt v. Apfel,* 201 F.3d 970, 972 (7th Cir. 2000) ("[W]e cannot reweigh the evidence or substitute our own judgment for that of the ALJ.  If reasonable minds can differ as to whether [the claimant] is disabled, we must uphold the decision under review." (citations omitted)).

In sum, the ALJ's assessment of Dr. Varma's opinion is supported by substantial evidence and does not warrant a remand of the case.

## V.  CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is AFFIRMED.  The Clerk is directed to enter a judgment in favor of the Commissioner and against Drew.

SO ORDERED.

Enter for this 29th day of August, 2008.

S/Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge